

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) |
| Respondent, | ) WD77521 |
| | ) |
| v. | ) OPINION FILED: |
| | ) December 15, 2015 |
| TIMOTHY T. McCLENDON, | ) |
| | ) |
| Appellant. | ) |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable J. Dale Youngs, Judge

Before Division Three:  Joseph M. Ellis, Presiding Judge, Karen King Mitchell, Judge
and Gary D. Witt, Judge

Appellant Timothy McClendon ("McClendon") was convicted after a jury trial in Jackson County Circuit Court of murder in the first degree, Section 565.020,[1] and armed criminal action, Section 571.015.  The charges arose out of gun fire at a car wash that resulted in the death of José Jenkins ("Jenkins").  McClendon was sentenced to life without parole and thirty years of imprisonment with the sentences to run consecutively.  McClendon now raises three points on appeal challenging his conviction.  We affirm.

---

[1] All statutory references are to RSMo 2000 as currently supplemented unless otherwise indicated.

# FACTUAL BACKGROUND[2]

## Underlying Events

On September 25, 2011, Jenkins told a friend, Reginald Thomas ("Thomas") that he was going to a car wash, located on Prospect Road in Kansas City, Missouri, to kill McClendon. Video footage from the car wash showed that Jenkins surveilled the car wash where McClendon was located. At around 7:30 p.m., Jenkins was walking back and forth in the rear of the car wash looking through the car wash stalls, seeking McClendon. Jenkins left and returned to the car wash in a different car.

At 7:46 p.m., McClendon was sitting on a concrete block next to his vehicle, which was being washed and detailed by Keith Martin ("Martin"). At 7:48 p.m., Jenkins came out from the rear of the car wash, ran up to McClendon, fired his gun at McClendon, and then ran. McClendon reached into his car and then returned back into the street and fired his gun at Jenkins. Martin saw the exchange of gunfire and fled the scene. Jenkins fled back through a car wash bay and fell to the ground as McClendon continued to fire. The video shows that Jenkins struggled to get up but was unable to do so. It was stipulated at trial that Jenkins was the initial aggressor and that the shots fired by McClendon in front of the car wash were fired in lawful self-defense.

McClendon returned to his vehicle, reached in for something, and walked back to the front lot reloading his gun. He then returned to his vehicle, drove into the street, and then drove down to the east side of the car wash where Jenkins was lying on the ground.

---

[2] We view the facts in the light most favorable to the jury's verdict. *State v. Williams*, 409 S.W.3d 460, 468 (Mo. App. W.D. 2013).

The video shows that Jenkins was trying to get up but could not. McClendon drove up to Jenkins, who was flat on the ground, and fired his gun multiple times into Jenkins. McClendon then backed up his vehicle, fired his gun again multiple times, and then drove away. McClendon drove to his girlfriend Kristie Myers's ("Myers") home and called her from outside telling her he had been shot and needed to go to the hospital. She moved McClendon into her van and drove him to Research Medical Center ("Research").

**The Investigation**

Jenkins was found dead at the car wash shortly after police were dispatched to the scene at 7:48 p.m. An autopsy revealed that Jenkins was shot thirty-two times. There were fourteen gunshot wounds to the head and eighteen gunshot wounds to the neck, chest, back, and right arm. Most of the entry wounds were on the back side of Jenkins's body. While at the car wash, police learned that a man with gunshot wounds, McClendon, had arrived at Research.

**The First Statement**

Detective Satter went to the hospital and contacted McClendon in the emergency room within one to two hours of the shooting. At this time, McClendon was not under arrest or in custody, and Detective Satter did not consider McClendon a suspect. Detective Satter was aware there was a surveillance video of the incident but he had not yet viewed it. He questioned McClendon about how he received his gunshot wounds. McClendon initially told Detective Satter that someone came to the car wash and began to shoot him but he did not say that he had returned fire. After explaining that a video existed of the shooting, McClendon then admitted he had indeed returned fire. This

3

interview lasted approximately twenty minutes.  In his report of this conversation, Detective Satter characterized the shooting as self-defense.  Detective Satter next located McClendon's vehicle and recovered shell casings and found bullet holes in the car.  The Detective also searched McClendon's girlfriend's van, where he located a Glock Model 17 9mm handgun with a magazine containing one remaining live bullet and an extra magazine with fifteen live rounds.[3]

The following morning, September 26, 2011 at 8:30 a.m., Detectives Ray Lenoir and Mark Speigel spoke with McClendon at Research.  At that time, they had not seen the videotape of the incident.  No *Miranda*[4] warnings were given to McClendon.  McClendon again told his story to the detectives, claiming that an unknown man had shot at him and he shot back.  Detective Lenoir testified that when the second statement was taken he had no reason to believe that McClendon had done anything other than act in self-defense.  A guard, however, was posted outside McClendon's room which, according to Detective Lenoir, is a common procedure where there is a shooting victim.  This interview lasted approximately thirty minutes.  Later that day, police viewed the videotape from the car wash.  Having viewed the video, Detective Lenoir no longer believed McClendon had acted in self-defense.

McClendon was escorted to police headquarters in the late-afternoon on September 26 and was given his *Miranda* warnings, which he waived.  Detectives Blank

---

[3] This gun was determined to have been the gun that shot Jenkins.  The forty-five 9mm shells found from the street, around Jenkins's body and in McClendon's vehicle were fired from this gun.

[4] *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and Lenoir interrogated McClendon, which was videotaped. There is no question that at this time McClendon was in full custody and under arrest.

The State charged McClendon with first-degree murder and armed criminal action. McClendon filed a motion to suppress his three statements to police in which he argued, in part, that the police used an improper two-step interrogation technique to deliberately undermine McClendon's constitutional rights. After a hearing on his motion, the court ruled that the first statement to Detective Satter on September 25 was admissible, as the interview was investigatory in nature and occurred so soon after the incident and McClendon was not a suspect. The court found that the second statement to Detectives Lenoir and Speigel was inadmissible because during the second statement McClendon was in custody and should have been *Mirandized*. Finally, the court ruled that the third statement in the late-afternoon on September 26, after McClendon had been *Mirandized*, was also admissible. The court rejected McClendon's argument that the State had used an improper two-step interrogation technique. McClendon's trial was presided over by a different judge, who confirmed the rulings as to admissibility made previously by the court, except that any references in the third statement to the suppressed second statement was also ordered excluded.

McClendon was found guilty of first-degree murder and armed criminal action. His motion for a new trial was denied. McClendon was sentenced to life in prison without parole and thirty years with the sentences to run consecutively. McClendon now appeals. Additional facts will be set forth as necessary in the argument section below.

5

## POINT ONE

In Point One on appeal, McClendon argues that the trial court erred in overruling his motion to suppress his third statement to police and admitting the statement at trial, through testimony and videotape, because detectives used an unconstitutional "two-step" interrogation technique that bypassed the requirements of *Miranda* and effectively deprived McClendon of his right to due process, a fair trial, counsel, and privilege against self-incrimination.

### Standard of Review

> In reviewing a trial court's ruling on a motion to suppress, there must be "substantial evidence" to support the ruling. The facts and reasonable inferences from such facts are considered favorably to the trial court's ruling and contrary evidence and inferences are disregarded. In reviewing the trial court's overruling of a motion to suppress, this Court considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling. Deference is given to the trial court's superior opportunity to determine the credibility of witnesses. This Court gives deference to the trial court's factual findings but reviews questions of law *de novo.*

*State v. Gaw*, 285 S.W.3d 318, 319-20 (Mo. banc 2009) (internal quotations and citations omitted).

### Analysis

McClendon argues that the police used a deliberate two-step interrogation technique to bypass the protections afforded by *Miranda* in order to secure McClendon's statement when he was unapprised of his *Miranda* rights only to later *Mirandize* him to secure a second admissible statement. He argues, therefore, that his third statement to police should have been suppressed.

6

"A criminal suspect is entitled to *Miranda* warnings, consistent with the Fifth Amendment right against self-incrimination, once the suspect is subjected to a custodial interrogation." *Gaw,* 285 S.W.3d at 321 (citing *Miranda v. Arizona,* 384 U.S. 436, 444 (1966)). Statements obtained by police during a custodial interrogation not preceded by *Miranda* warnings are inadmissible in court. *Id.* (citing *State v. Copeland*, 928 S.W.2d 828, 852 (Mo. banc 1996)).

In *Missouri v. Seibert*, the United States Supreme Court considered the implications of the two-step interrogation technique, which was increasingly being used by police departments to interrogate suspects. 542 U.S. 600 (2004). The Court described the issue as follows:

> This case tests a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time. The question here is the admissibility of the repeated statement.

*Id.* at 604. In *Seibert*, the interrogating officer admitted that he deliberately used this two-step interrogation technique, consciously withholding *Miranda* warnings. *Id*. at 605-06. Using this practice, the officer would first obtain the sought after information before *Mirandizing* the suspect, subsequently *Mirandize* the suspect, and then repeat the questions to re-solicit the same information, often referring back to the first un-*Mirandized* statement. *Id*. The Court held that under these circumstances the *Mirandized* statement would be inadmissible because the *Miranda* warning would be ineffective. *Id.*

7

at 611-12. "[W]hen *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *Id*. at 613-14 (quoting *Moran v. Burbine*, 475 U.S. 412, 424 (1986)).

The *Seibert* opinion, being a plurality, left unclear what test would be used to determine whether post-waiver statements could be admitted into evidence. The four-justice plurality created an objective test which would look at various factors to determine whether the *Miranda* warnings were effective. *Id* at 615. These factors included,

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Gaw*, 285 S.W.3d at 322. Justice Kennedy, who provided the crucial fifth vote, adopted a narrower test, "applicable only in the infrequent case ... in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id*. at 322. Under this approach, "[w]hen an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." *Id*. This is "a subjective test that relies on a finding of fact by the trial court (made specifically or implied) that the arresting officer was deliberately trying to skirt the protections of *Miranda*." *Id*. The Missouri Supreme

8

Court held in *Gaw* that Justice Kennedy's narrower "deliberate violation" standard is the lowest common denominator between his views and the four-justice plurality and therefore is the standard to be applied. *Id*. at 323-24.

Accordingly, in Missouri, the test for whether police have used an improper two-step interrogation technique, such that the suspect has been deprived of his constitutional rights, is a subjective test that looks to whether the police deliberately tried to skirt the protections of *Miranda*. *Id*. The trial court's role in protecting the accused's *Miranda* rights is then heightened because the protection of the accused's rights turns on whether the trial court believes the officer's "questioning prior to the advisement of *Miranda* rights was inadvertent or intended to acquire an advantage in the interrogation process." *Id*. at 324. If the trial court determines that the pre-*Mirandized* questioning was not a deliberate strategy used by police, then the question of the admissibility of the statement reverts back to whether it was "knowingly and voluntarily made." *Id*. at 325 (citing *Oregon v. Elstad*, 470 U.S. 298, 309 (1985)).

McClendon argues that the second and third statements made to police were in response to a coordinated two-step interrogation technique. McClendon claims that despite Detective Lenoir's statement that during the second interview he understood that McClendon had acted in self-defense, the detective knew there was a videotape to be examined and remaining evidence that could still implicate McClendon. Thus, the detective's questioning of McClendon, prior to the viewing of the tape, was an opportunity to talk to McClendon prior to *Mirandizing* him and, therefore, a violation of

his constitutional rights. The State argues that there is no evidence that the police deliberately withheld *Miranda* warnings trying to obtain an advantage in interrogation.

McClendon's argument that the police deliberately used a two-step interrogation technique to undermine his constitutional rights is not supported by the record. Detective Lenoir, who interviewed McClendon in the hospital during his second un-*mirandized* suppressed statement, testified that when he spoke with McClendon early in the morning following the shootings, he did not believe McClendon had done anything other than act in self-defense as McClendon had claimed and continued to claim. At that time, the detective had not yet viewed the videotape footage of the incident and had no information regarding the identity of the victim or details regarding how many shots had been fired and by whom. *Id*. It is also reasonable to infer that he would not have any information from the autopsy, as Jenkins's autopsy also occurred on the same day. As the second interview took place from approximately 8:30 a.m. to 9:00 a.m. on the 26th, it is reasonable to infer the autopsy results were not yet available to police.

It was only after reviewing the videotape seven hours later that police brought McClendon into the police station for questioning, where he subsequently waived his *Miranda* rights. Detective Lenoir specifically testified that he did not and does not intentionally fail to *mirandize* someone when he considers them a suspect because he knows the statement would be inadmissible. There is simply no evidence in the record that police deliberately decided to withhold *Miranda* warnings pursuant to a strategy to elicit information first and *mirandize* later. There is also no indication that the trial court found the detective's testimony to be anything other than credible.

10

The trial court found that the circumstances here did not run afoul of *Seibert*. Apparently utilizing the objective factors set out in *Seibert*, the trial court found (1) there was a significant time lapse (seven hours), (2) McClendon had the opportunity to clearly think through his first two interviews before giving the third statement, (3) the primary interviewer was a different person, and (4) the interview was in a different location.

Although the trial court applied the incorrect test under *Gaw* and court did not explicitly make a finding regarding the s*ubjective intent* of the detective, the court did find under the objective test that McClendon's *Miranda* rights were not undermined. This proves fatal under the subjective test as well because the challenged practice must be predicated on violating *Miranda*. *See Gaw*, 285 S.W.3d at 322 ("[w]hen an interrogator uses this deliberate, two-step strategy, *predicated upon violating* Miranda *during an extended interview*, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps") (emphasis added). In addition, we must view the facts and reasonable inferences favorable to the trial court's ruling and disregarding contrary inferences. *Gaw*, 285 S.W.3d at 324-25. The court had substantial evidence before it that the police did not deliberately employ a deliberate unconstitutional two-step interrogation technique. Here, the *Miranda* warnings were not given "in the midst of a coordinated and continuing interrogation" such that it was likely to mislead McClendon and deprive him of the ability to knowingly and voluntarily waive his rights. *See Seibert*, 542 U.S. at 613-14.

Finally, in order for a statement to be admissible after finding that there was no improper two-step interviewing technique employed, the statements must have been

11

knowingly and voluntarily made. *See Gaw*, 285 S.W.3d at 324. Apart from his argument that police used an improper two-step interrogation technique, McClendon does not contest a knowing and voluntary waiver of his *Miranda* rights for his third statement and nothing in the record suggests that the waiver was not knowingly and voluntarily made.

Point One is denied.

## POINT TWO

In Point Two on appeal, McClendon argues the trial court erred and abused its discretion by failing to declare a mistrial after the State's closing argument regarding why McClendon was hanging out at the car wash all the time with a gun and all that ammunition, because this conduct was inadmissible evidence of uncharged bad acts and had no logical relevance to establish that McClendon was guilty of first-degree murder.

### Standard of Review

This Court reviews a trial court's refusal to grant a mistrial for abuse of discretion. *State v. Shaffer*, 439 S.W.3d 796, 800 (Mo. App. W.D. 2014).

> This is because the trial court has observed the complained of incident and is in a better position than is an appellate court to determine what prejudicial effect, if any, the alleged error had on the jury. An abuse of discretion is found when the trial court's ruling is clearly against the logic of the circumstances then before it and when the ruling is so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration.

*Id*. (internal citations and quotations omitted). A mistrial is a drastic remedy that should only be granted when the prejudice to the defendant cannot be removed in any other way. *Id*. (citing *State v. Jones*, 134 S.W.3d 706, 717 (Mo. App. S.D. 2004)).

12

**Analysis**

In closing argument, the State argued, in pertinent part, as follows:

> Something that's happened through all this is we've forgotten to look at him. He hangs out at the car wash at 43rd and Prospect almost every day for hours on end. What's he doing? He has at least 61 rounds of ammunition on him.

McClendon's counsel immediately objected to the argument, challenging the State's alleged implication that McClendon was engaged in uncharged illegal conduct at the car wash. Counsel moved for a mistrial. The court refused to grant a mistrial but instructed the jury to disregard the State's question of "What's he doing there?" All of the facts contained in this statement were previously admitted into evidence in the trial.

Assuming, as the trial court found, that the implication the State was trying to make was improper propensity evidence, the question is whether the court's remedy, the instruction to the jury to disregard the comment, sufficiently removed the prejudice to McClendon or whether a mistrial was required. As stated *supra*, a mistrial is a drastic remedy and is only required where prejudice to the defendant cannot be removed in any other way. *Shaffer*, 439 S.W.3d at 801. Normally, an instruction to the jury to disregard inadmissible evidence or improper argument is a sufficient remedy, as we must presume the jury has followed the court's instructions. *Id*. (citing *State v. McFadden*, 369 S.W.3d 727, 752 (Mo. banc 2012)); *see also State v. Wyman*, 945 S.W.2d 74, 78 (Mo. App. W.D. 1997) (a trial court ordinarily cures any error by instructing the jury to disregard it); *State v. Newson*, 898 S.W.2d 710, 714 (Mo. App. W.D. 1995) (same).

The trial court, being in the best position to judge the prejudicial effect of improper arguments on the jury, is given discretion in its determination of whether a mistrial is warranted. *Shaffer*, 439 S.W.3d at 800. The only portion of the argument by the State that was not a fact in evidence was the question asking what McClendon was doing at the car wash. The jury was instructed to disregard the comment and we must assume that they followed this instruction. Given the trial court's curative instruction to the jury to disregard the improper argument, we cannot say the trial court abused its discretion in refusing to grant a mistrial.[5]

Point Two is denied.

## POINT THREE

In Point Three on appeal, McClendon seeks plain error review of the trial court's failure, *sua sponte*, to prevent the State from arguing in closing that there must have been a history between McClendon and Jenkins if McClendon shot Jenkins 31 times because the evidence was inadmissible evidence of uncharged bad acts, argued facts not in evidence and excluded evidence, which deprived McClendon of his rights to due process, a fair trial, and being tried only for the charged crime.

---

[5] If we ignored the curative instruction and considered the prejudicial effect this statement may have had on the jury, we cannot say that this statement would have warranted a mistrial. The jury saw a video of the violence, which showed McClendon deliberately go out of his way to return to Jenkins's body rather than flee the scene. As the jury was instructed, a person can only use deadly force if he reasonably believes it is necessary to defend himself from the imminent use of unlawful force. *See* MAI-CR 3d 306.06A; *see also State v. Hiltibidal*, 292 S.W.3d 488, 493 (Mo App. W.D. 2009). McClendon reloaded his firearm, drove his vehicle to the back of the car wash, and continued to shoot Jenkins as he was lying on the ground unable to move. Given the significant evidence against McClendon, we cannot say that this argument would have had a decisive impact on the jury's determination. *See State v. Francis*, 60 S.W.3d 662, 672 (Mo. App. W.D. 2001) (when a prosecutor makes an improper statement, relief is only appropriate where the defendant can show a reasonable probability that, in the absence of the statement, the verdict would have been different).

14

## Standard of Review

As McClendon neither objected at trial nor preserved his claim of error in his motion for a new trial, he requests plain error review by this court of his argument in Point Three. "Non-preserved issues are reviewed for plain error, if the error resulted in manifest injustice or a miscarriage of justice." *State v. Celis-Garcia*, 420 S.W.3d 723, 726 (Mo. App. W.D. 2014) (quoting *State v. Taylor*, 298 S.W.3d 482, 491 (Mo. banc 2009)).

> Plain error review is used sparingly and is limited to those cases where there is a clear demonstration of manifest injustice or miscarriage of justice. Claims of plain error are reviewed under a two-prong standard. In the first prong, we determine whether there is, indeed, plain error, which is error that is evident, obvious, and clear. If so, then we look to the second prong of the analysis, which considers whether a manifest injustice or miscarriage of justice has, indeed, occurred as a result of the error. A criminal defendant seeking plain error review bears the burden of showing that plain error occurred and that it resulted in a manifest injustice or miscarriage of justice. The outcome of plain error review depends heavily on the specific facts and circumstances of each case.

*Id*. at 726-27 (quoting *State v. Ray*, 407 S.W.3d 162, 170 (Mo. App. E.D. 2013)). With regard to claims of plain error during closing argument, "[p]lain error relief as to closing argument should rarely be granted and is generally denied without explanation." *State v. Crowe*, 128 S.W.3d 596, 600 (Mo. App. W.D. 2004) (quoting *State v. Garner*, 14 S.W.3d 67, 76 (Mo. App. E.D. 1999)). "A trial court has broad discretion in controlling the scope of closing argument. Even if a closing argument is improper, we will reverse a conviction only if the defendant establishes that the comment had a decisive effect on the jury's determination." *Id*. (internal citations and quotations omitted). To meet this

standard, the defendant must demonstrate a reasonable probability that the verdict would have been different had the error not been committed. *Id.*

## Analysis

In closing argument, McClendon's counsel argued that Jenkins had stalked McClendon and walked up and shot a defenseless man. Counsel also stated that McClendon did not know Jenkins. The State in rebuttal closing argument stated as follows:

> This is not the kind of crime that occurs between strangers. Somebody doesn't stalk somebody for an hour before he shoots him because they're a stranger. Somebody doesn't shoot somebody in the back 31 times when you don't know them.
> He knew him. There's a history there. We just don't know what it is and that's one of those unanswered questions we talk about in *voir dire*. He knew him. There's a history. We don't know what it is. We don't have to prove that to you.

McClendon did not object to this argument at trial.

McClendon argues that evidence of uncharged bad acts was inadmissible and the State's improper allusion to them resulted in manifest injustice and the prosecutor introduced or commented upon facts not in evidence. We disagree with McClendon's characterization of the argument. First, even a cursory review of the argument shows that the State did not specifically mention any specific bad acts or other conduct not in evidence. The only facts commented upon were facts in evidence; i.e., that Jenkins stalked McClendon prior to the shooting and McClendon shot Jenkins 31 times. The State did not state or imply it was in possession of evidence that had been excluded or was not in front of the jury. Rather, the State argued from the evidence that there was a

16

reasonable inference that there was a history between the two men and, thus, McClendon's action in going out of his way to continue to shoot Jenkins after he could have safely escaped was motivated by something other than a desire for self-preservation.

Second, the issue in the case was whether McClendon's shooting of Jenkins was justified as an act of self-defense. McClendon's counsel argued, in part, that McClendon did not know Jenkins, presumably to infer that McClendon had no reason to want to kill Jenkins but rather he was acting purely in self-defense. In rebuttal, the State was permitted to argue the reasonable inference from the facts in evidence that this was not a random act of violence to which McClendon reasonably responded, but a situation in which it is reasonable to believe that McClendon and Jenkins had some sort of motivation to kill one another. *See State v. Williams*, 366 S.W.3d 609, 624 (Mo. App. W.D. 2012) (motive is relevant where defendant claims he acted in self-defense). It was a reasonable inference from the evidence presented at trial that the circumstances were such that there was some history between these two men and not a random act of violence, and the State was allowed to argue such. *See State v. McFadden*, 369 S.W.3d 727, 748 (Mo. banc 2012) (the State is allowed to argue the evidence and all reasonable inferences from the evidence during closing arguments); *see also State v. Harris*, 870 S.W.2d 798, 814 (State has the right to draw any inferences from the evidence which he believes in good faith are justified). This is particularly true in rebuttal, where the State is given considerable leeway to make retaliatory arguments at closing and may retaliate to an issue raised by the defense even if the prosecutor's comment would have been improper. *See State v. Gaines*, 316 S.W.3d 440, 456-57 (Mo. App. W.D. 2010) (prosecutors are given

17

considerable leeway in rebuttal, even if the comment otherwise would be improper);

*State v. McFadden*, 391 S.W.3d 408, 422 (Mo. banc 2013) (same); *State v. Minner*, 311

S.W.3d 313, 327 (Mo. App. W.D. 2010) (same).

We find no error, let alone plain error.  Point Three is denied.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
Gary D. Witt, Judge

All concur

18